Mr. Murphy. Mr. Chief Justice, and may it please the Court, Congress passed the NVRA to serve competing goals, increasing the number of eligible registered voters, but decreasing the number of ineligible ones. And this Congressional compromise is evident in the statute's conflicting mandates.  It requires states to undertake general programs to remove ineligible individuals, but at the same time places limits on those federally mandated removal programs, including that states may not remove individuals for changed residence unless they fail to respond to a notice and to vote over two Federal elections. I know you have the exceptions clause in B-2. Would your case have been stronger without the enactment of Section B? Without the In other words, could you rely just on A and D? If there was no If there were no B at all. I think certainly I think that if there is no failure to vote clause, that's one of the main prohibitions on which they are relying. But I think you have to interpret B in light of D, of course. Yes. And D clearly indicates that we, if we so long as we send individuals a notice and so long as we wait two Federal elections before we remove them, that that is acceptable. So why bother Because of the accept clause. Well, because you have to interpret the substantive provision in B-2, the failure to vote clause, in a way that reconciles it with the use of failure to vote. And only our position interprets B in a way that allows the back-end use of nonvoting in D, because Mr. Murphy, the Act itself gives a safe harbor provision that triggers the confirmation of the notice. And that safe harbor provision doesn't rely at all on failure to vote. It relies on post office change of address form. So isn't that some clue, the safe harbor, that Congress didn't want failure to vote to be a trigger for this procedure? I don't think so, Your Honor, because I think that is a safe harbor for something completely different. They treat it as a safe harbor for meeting an implicit element in D, that a State have objective evidence that an individual has moved. But that element is not there. In fact, the Postal Service provision is a safe harbor for on the other side of the balance between removing ineligible voters and keeping eligible voters on the roll. This is a very complicated system for a very simple position. If you have any reason to believe someone has changed address, just send them a notice. And after two election cycles, disqualify them. Why have the post office provision at all? Why have any other provision? As it is, I understand Ohio now is not waiting for people to miss two election cycles. They are waiting every year. They are purging, right? No. We run the notices every year, but we still wait the two. Now, you have taken the position in your brief that you really don't need anything. You need you could send out a notice any time, any place, and if someone fails to respond to it, you can purge them. Isn't that your position? No. No. Our position is the notice gets sent out. If they respond, then obviously you cannot remove them. But my point is you don't even need the failure to vote two years to use the notice. That's right, because a statewide canvas would not be based on failure to vote whatsoever. And so that's why they have to read into D an element that they just make up from whole cloth, which is that they have objective evidence of a move for sending the notice. The Senate report that supported the NVRA explicitly says that what they wanted to avoid was a mailing that is unresponded to being a cause for removing someone. So if that was its purpose, why wouldn't it make sense that the only reason that you can change send the notice is if you have some reasonable basis to believe someone has moved? Failure to vote can't be it because the Senate report says that they believe that failure to vote was a constitutional right. You have a right not to vote. So there's a couple points there. The first was what if people do not respond to the notice? I agree that there is a Senate report suggesting that they were concerned that people would be removed merely for failing to respond, but Congress did not put an objective evidence element into the D procedure in response to that concern. They put in the safe harbor what they called the fail-safe voting on the back end. So if an individual doesn't respond, they still have two Federal elections in which they can show up to vote. So that's how they dealt with that provision. With respect to failure to vote, I think the legislative history is quite clear that the concern was removing individuals merely for failing to vote in a recent election. That's what the report says at page 17, and that's not what Ohio does. Sotomayor So why have the three provisions having to do with the post office notice? That seems like a very reasonable you why do you need it? Because that is the minimal effort on the other side of the balance. As I was trying to mention to Justice Ginsburg, I think that is a safe harbor for the State's obligation to engage in maintenance efforts. A-4 says that the States have a duty to remove ineligible voters, and C says begins by saying you can meet your obligation to remove ineligible voters by going through this process. It's the minimum on the one side of the balance. Kagan But, General, if I can take you back to Justice Ginsburg's question, because it seems as though you are effectively turning HD-1 into a kind of safe harbor in this sense. HD-1 says that these confirmation procedures are a permissible part of the program, even though part of the confirmation procedures are about not voting. So that's clear that HD-1 says that. But you are trying to take that and convert it into something bigger and broader, essentially saying if you use these confirmation procedures, your entire program is going to be insulated from criticism, even though there's another part of your program that explicitly relies on nonvoting. And I don't see that as in any way being the point of HD-1. You're trying to take HD-1, which says, sure, you can have a part of the program that does this, and turn it into a much bigger and broader safe harbor for everything that you do. So my response there would be you have to interpret the words of 8b-2, the failure-to-vote clause, in a way that would not prohibit what 8d requires. And it affirmatively requires the use of nonvoting over two Federal elections. We have the proximate cause argument for why the failure-to-response to the notice breaks the causal link. And there was this debate in the 1990s. Kagan I must say I don't understand the – I think this is a little bit of a different question, but since you've raised it, the proximate cause argument, I don't understand. Because essentially what the Ohio program does is it says nonvoting, failure-to-respond, nonvoting. And you're trying to pick out the middle piece of that and say that's the only proximate cause. That's just not the way we think of proximate cause in any area. Bursch So I think clearly the by reason of adopts a proximate cause test. This Court has repeatedly said it's a flexible test. Kagan No, no argument on that. Sure, there's a proximate cause test, but there's more – there can be more than one proximate cause in the world. Bursch Well, exactly. And the Court has said that you have to pick the proximate cause test that fits the statute. And this statute, the last cause undoubtedly is failure to vote. That's why I think the best way to reconcile B and D is to say that a failure-to-respond to the notice breaks any causal prohibition between failure-to-vote and removal. And I think there was this debate. Alito Why do you need the proximate cause argument at all? What the statute says is that someone may not be removed from the list by reason of the person's failure to vote. It can't mean but-for cause, because then it would run it because the statute itself takes failure-to-vote into account in D. That's one of the things that is necessary in order for someone to be removed from the list under D. So it can't be but-for. And in the HAVA, Congress used the term solely. So why isn't the best interpretation of this that one cannot be removed from the list solely because of failure-to-vote? That's absolutely correct. In CSX, the Court said one component of a proximate cause test, it was a malleable phrase, was the sole proximate cause test. Well, isn't that just adding a word into the statute that Congress wrote? Congress said by reason to vote. There are multiple places in the U.S. Code where Congress wants to say solely by reason, and Congress says it. It means something different, because there are lots of situations in which two components together cause something. And so to add that word solely is to change the meaning of the statute, and that word is not in this provision. Well, we think it's the best reading to reconcile the two provisions. Which was just the? The solely, because the failure-to-respond. The HAVA and the NFRA and VRA provision? No, the B and D, to reconcile the two provisions. Okay. And remember, the solely clause from HAVA was not the only provision that was adopted in HAVA. In addition, HAVA, when it added that solely clause, also added the clarifying amendment to the failure-to-vote clause. General, everybody is looking here for a way to reconcile these two provisions. I mean, you're right. These two provisions are like, okay, what do we do with these? But why isn't the obvious way to reconcile the two provisions just to say, look, you got this failure-to-vote clause, but don't think that this failure-to-vote clause bars a State from using the confirmation procedures. It doesn't bar a State from using the confirmation procedures. That can be a permissible part of the State program. So that's your way to reconcile the two things. Taken on its own, the failure-to-vote clause looks as though it might bar confirmation procedures. The confirmation procedure says, no, not these. So, look, I think that may have been one reconcile – one way to reconcile it. Our way may have been one way to reconcile it. The States debated the Federal Government on this precise issue throughout the 1990s, and then Congress intervened and reconciled it with the addition of the solely clause in the HAVA provision. Well, the solely clause in HAVA is a completely independent provision in a completely independent statute. I mean, it's not the clarifying amendment, which we can talk about. I mean, the solely clause is – it's a part of a different provision in a different statute dealing with a related but different subject matter. So there would be no reason to take one provision that says solely and says, because that provision says solely, we're going to treat this provision as also saying solely when this provision does not say solely. In fact, we have a rule against that in statutory interpretation. Usually we say, look, Congress knows how to do a solely provision. It didn't do it here. But what it did add in the same law, in the HAVA law that in the computerized list maintenance for statewide programs it uses solely, and then with respect to the failure to vote clause in the NVRA, it adopted a clarification amendment that said except that nothing in this provision shall be construed to prohibit the State from using the procedures in C&D. So I think you have to interpret the clarification amendment with the solely clause because it was in the same law. But the clarifying amendment says, you're exactly right. It says, don't interpret the failure to vote clause as preventing use of the confirmation procedures, and that's my point about how these two things are reconcilable. The clarifying amendment says how they're reconcilable. I'm losing. I'm sorry. Don't, don't interpret the failure to vote clause as barring the confirmation procedures. States can use the confirmation procedures, but that doesn't mean that they can do anything else that they want to on top of the confirmation procedures. So you still, it's a, it's a rule of clarification. So it says you have to construe B-2. And I think that with that, combined with the Soli clause, makes quite clear that you have to interpret the bi-reasonable language in some way to break the causal link between voting and removal that is required in D. I think interpreting it to be the sole cause is the way to accomplish that feat. I think that's why there was a clarification amendment on the one hand, and B, and the Soli clause. I also think the public context is really important here. The public context. Sotomayor, can we get to the essence of this case? It appears as if what you're, what you're reading is that the failure to vote is enough evidence to suggest that someone has moved. That seems to be your position, because it can be the only one. But is that a reasonable effort to draw that conclusion? When you do, results in disenfranchising disproportionately certain cities where large And across the country, they're the group that votes the least. In large measure because many of them work very long hours. And without the golden week that Ohio rescinded, many of them can't vote because the polls are not open while they're not working. Places like Cleveland have very, very, very long lines of voters trying to vote. All of these impediments result in large numbers of people not voting in certain spots in the state. So if the word reasonable effort has any meaning, with a Congress who said that the Constitutional right, how can we read this statute to permit you to begin a process of disenfranchising solely on the basis of that, with no independent evidence whatsoever that the person has moved? You can use the post office, they tell you that. You can use certified mail. You could use juror change of addresses. You can use driver license, motor vehicle change of addresses. There are dozens of other ways that you could verify a change of address. Yet you're suggesting that using a failure to appear at an election or elections as evidence of moving, when people have a right not to vote if they choose, many have, and others like the veteran who's a plaintiff in this case, explains the reasons why he failed to vote in two elections. I have to give the meaning, the words that Congress said. Don't use the failure to vote as a result, that results in someone being disenfranchised. I don't understand how you can say that the failure to vote can be used as the sole basis for sending out notices. It's not a reasonable inference, so how could it be a reasonable effort? So the failure to vote clause says that the failure to vote cannot be the sole basis for removal, not sending a notice. It says nothing about sending a notice. I would also add that subsection D, within subsection D, Congress identified the minimum evidence that it thought was sufficient for the states to remove individuals for failure to respond. So if that's minimum, don't you think that maximum should see something a little bit more than the failure to vote? Well, it does, because- I mean, a change in the residence in accordance with B, C, and D. And B has you using the post office, correct? C. C has you using the post office. B says, shall not be removed, shall not result in the removal of the name of a person from any official list registered to vote in an election for the federal office by reason of the person's failure to vote. So- That's correct, and if you interpret that to be a sole proximate cause test, then ours does not satisfy it because nobody is removed solely by reason of their failure to vote. Exactly, we're saying it's not a sole- They're removed if they fail to respond to a notice and fail to vote over six years, which is more than the minimum protection- What are the statistics that show that the vast majority of people that you disenfranchise from voting, that you strike from the election rolls, have actually moved? So there was no statistical evidence that is necessary because Congress made the determination of what evidence is necessary, and that determination- No, when it gave you an example, it gave you an example- But that was an example for meeting our minimum duty on the other side. So there's a minimum duty, a minimum amount of protections for eligible voters, and a minimum requirement on the States to undertake a minimum- So there's a minimum requirement on the voter who gets your notice to respond. Absolutely, the statute places a requirement on the voter to respond. But that's after you have evidence that they've actually moved. No, there's nothing in the statute that suggests that there's limitations on the trigger. With respect to minorities, I would add, by the way, that our position is not at all B-1. Congress responded to that concern, suggesting that the process must be uniform, nondiscriminatory, and in compliance with the Voting Rights Act, but that- Well, that's the problem, is that there's a strong argument this is, at least in impact, this is discriminatory. I understand that some don't believe in impact, but you have to look at it to determine whether something's reasonable. But they didn't raise a B-1 claim. They didn't raise a B-1 claim. We're only here today under the failure-to-vote clause. And if I could reserve the rest of the- I'll give you a couple more minutes so you can get more of your argument out. Okay. Thank you, Your Honor. So I really would like to get back to the public context in which the HAVA provisions were enacted, because I think that public context is quite powerful. On the one hand, you had States from 1994 all the way up to the HAVA amendment debating the Department of Justice whether the processes, just like Ohio's, were permissible. On the other hand, you had nobody, there was nobody who made the argument that B could somehow be read to actually make D inoperative. Under our view, the clarification in HAVA was designed specifically to address the longstanding debate that started even before the statute became effective. States were suggesting that they should engage in approaches like Ohio's, all the way to the final FEC report, where South Dakota suggested clarifying the NVRA in a way that's quite helpful to the States here. And HAVA was passed, and it had two provisions. It had the clarifying amendment, express the clarifying amendment, on the one hand, and then it had the related provision dealing with State-wide mismaintenance, which is effectively a comparable decision, I think, if you read both of those together. How many States do it this way? That is, you get the notice, as I understand it, if you miss just one election. That's incorrect. If you missed, if you have no voter activity over a two-year period, which would include one general election, and then one off-year election, and any primary elections as well. Yeah. Are there other States who do it just like Ohio? There are several, many States who, I think around eight, that use failure to vote as the trigger for the notice. I don't, some use two, some use three years, some use four years. But the problem with my friend's position on the other side is it would not only outlaw all of those States, those who use failure to vote as the trigger for sending the notice, it would outlaw any State that takes into account failure to vote on the front end, and that includes many States that target individuals who have not voted recently with a non-forwardable mailing and then respond to that non-forwardable mailing with a confirmation notice for any individuals who the non-forwardable mailing has bounced back to. That would be equally prohibited under the logic of their argument here today, because they are saying any front-end use of non-voting would be illegal. Thank you, counsel. You'll have a couple of minutes for rebuttal. General Francisco. Mr. Chief Justice, and may it please the Court, if I could begin with Justice Kennedy's question. Justice Kennedy, we think that Ohio's process was permissible before Congress enacted the Clarification Amendment in 2002, but the Clarification Amendment made it even clearer for two basic reasons. First, Sections 8C and 8D, that's the postal service process and the notice process, require that non-voting be the immediate cause for removal. The only way you can construe 8B2 is not prohibiting that, is if 8B2 is limited to removing people only solely by reason of their failure to vote. And second, this reflected a significant shift in the Federal-State balance at the time. Prior to the NVRA, many States removed people solely for failure to vote. Others had notice processes that were far less protective than Ohio's notice process. None of them had a four-year waiting period. What the NVRA did was it required everybody to improve their processes well beyond what they were before the NVRA was passed, but beyond that, left the States with flexibility. And there's nothing in the statute that says that within that range of flexibility, States are barred from using a non-voting trigger in conjunction with 8D's protective notice process. Sotomayor, could you tell me there's a 24-year history of Solicitor Generals of both political parties, under both presidents of both political parties, who have taken a position contrary to yours, before the amendment and after the amendment? In fact, the Federal Election Commission, when it wrote to Congress with respect to the Help America Vote Act, took the position the old Solicitor Generals were taking. Everybody but you today come in and say the act before the clarification said something different. Seems quite unusual that your office would change its position so dramatically. I might accept that if you thought the Help America Vote Act, in fact, clarified something that was ambiguous, but you're taking a very different position. You're saying even before that act, it was clear you could do it this way. Well, Your Honor, what I'm saying is I think that the Help America Vote Act and the clarification amendment made it even clearer. And after that clarification amendment – Well, so please explain the change of position. Sure. After that many presidents, that many Solicitor Generals, this many years, the vast majority of states, over 35, over 40 actually, who read it the way your opponents read it, most people read it that way, how did the Solicitor General change its mind? Do you believe this doesn't have an impact, a negative impact, on certain groups in the society? Well, Your Honor, I believe that after Congress passed the clarification amendment, it clarified what was at the time an ongoing debate between the Department of Justice and the states. And the only plausible way to read that public context, and with respect to some members of this Court, public context is not legislative history. So point me where in the legislative history people say that with absolute clarity. As I understand the legislative history, both sides are saying in its history, this helps us. And, Your Honor, public – So it's as ambiguous as the language may be. Public context is not legislative history. Even the most diehard textualists look to the public context in which a law was enacted. I refer you to Justice Scalia's opinion in Branch v. Smith and Professor Manning's article in What Divides Textualists from Purposivists. And that public context makes clear that the only thing that was in need of clarification at the time the clarification amendment was passed was precisely this question, whether states like Ohio's could use a non-voting trigger in conjunction with the 8D process. And there's nothing in this statute that bars that. I think it reflects the balance that Congress was trying to strike in the NBRA between on the one hand dramatically increasing the number of voters on the voter rolls, but on the other, giving states the flexibility they need to manage the issues that arise when you have overinflated voter rolls. Was it the position of the United States – and I thought it was, but you correct me if I'm wrong – I thought that the United States was taking the position consistently that non-voting was not a reliable indicator of residence change? Your Honor, that's partly correct. Our prior position was based on an understanding of the statute that read into it a reliable evidence requirement, and we said that non-voting was not that kind of reliable evidence. Our current position is that when you look at the statute, there's simply no way to read into it a reliable evidence requirement that's found nowhere in the text and that Congress in fact rejected. And again, it reflects this Federal-State balance where 8B-2 and 8D set a very protective floor, required everybody to be far more protective of voters than they were before the Act was passed. And so the Federal-State balance was that states had flexibility over the management of their list maintenance programs precisely so they could address the other side of the compromise, which was giving states the flexibility they need to address the issues that arise when you have bloated voter rolls. Kagan. Kagan. Kagan. General, it would be right, isn't it, I think you acknowledge this, that if your position is correct, that the failure-to-vote clause simply doesn't apply to removal programs for change of residence. Is that correct? Your Honor. Because, of course, all of those programs have to use the confirmation procedures and your position is that if you use the confirmation procedures, that's a, basically that's an out for everything. That's correct, but it does have much broader application. So, not much broader application because how could you possibly use failure-to-vote to, for, you know, mental incapacity or criminal convictions? What broader application does it have? What I think it is, it does a couple of things. One of the principal things, issues at the time the NVRU was passed, was what you put your finger on. This practice amongst some States of having a kind of use-it-or-lose-it mentality to the right to vote. You either exercise it or you lose it, and they definitely wanted to take that off the table. The other thing they wanted to do is make sure that you could never use failure-to-vote to conclusively presume that any other basis for removal is valid. Right. But I guess what I'm asking, General, is sort of two related questions. Number one, if the effect of your position is to say, look, we don't mean for this failure-to-vote clause to apply to programs about change of residence, why didn't Congress just say that? That's number one. And number two, I mean, I concede the point that it's not, it doesn't make the failure-to-vote clause completely meaningless, but I'm still looking for the place where it has some real impact on anybody. And I think it's because, and this comes out in some of the legislative history, prior to the NVRA, States simply used failure-to-vote as a proxy for the whole panoply of grounds for removal. They didn't necessarily tie it to this basis or that basis, and Congress was very concerned about simply relying on the failure-to-vote. So they wanted to take it completely off the board. And B-2 is the only provision in the statute that takes it completely off the board and says nobody can ever be removed merely for their failure-to-vote. But when you combine non-voting with the 8D process, the very protective process that Congress set that required everybody to improve their procedures, there's simply nothing in the statute that prohibits that. And the Clarification Amendment makes that even clearer. Kagan. With respect, General, I don't think you answered either of the two questions that I asked you, so I'll try again. Why wouldn't they just have said the failure-to-vote clause doesn't apply to where a State uses the confirmation procedures? Well, Your Honor, I don't know the answer to that, and I would say that the NVRA is not one of these statutes that I would hold up as a paradigm for legislative draftsmen. Okay. So the second question is, what is left of the failure-to-vote clause, practically speaking? It takes completely off the table using failure-to-vote as a conclusive presumption for any other ground for removal. Well, what other ground are we talking about? Well, prior to the NVRA It's not – nobody used it as a presumption for mental incapacity. Well, Your Honor, actually, the legislative history makes clear that prior to the NVRA, they used it as a presumption for meeting the whole panoply of different bases for removal. Well, wasn't it – wasn't it itself considered to be a ground for being removed? It wasn't necessarily – these states didn't regard it necessarily as a proxy for anything else. They just took the position that it was use it or lose it. If you didn't vote for a certain period of time, that was grounds for taking your name off the eligibility list. That's absolutely correct, and that's why it meant to address both of those issues. Those states that had a use it or lose it mentality, you can never do that. And those states that used it to conclusively presume that some other basis for removal has been met. But here, Ohio joins the initial failure to vote with the very process that Congress established for determining whether somebody has been removed from the voter rolls. And with respect to the notion that somehow 8d1b does not set forth a separate process apart from the 8c postal service process, it clearly does. If you look at Section 8d, there are two provisions. There's 8d1a, which allows you to remove somebody if they've notified you that they've moved. Clearly a stand-alone process. 8d1b is simply the corollary to that. If you haven't notified us that you've moved, here's another process that States can use to make that determination. Thank you, General. Thank you, Mr. Chief Justice. Mr. Smith. Mr. Chief Justice, and may it please the Court. I think it's important to recognize that the supplemental process violates Section 8 of the NVRA in two distinct ways. Of course, it violates the failure to vote clauses we've been discussing. But it also violates 8a, because 8a sets out an exclusive list of four bases that can be used for purging people from the rolls and bars States from doing it under any other circumstances. And the supplemental process, the way it is designed, it assures that many, indeed probably most, of the people who are purged have not moved, let alone moved to a different county or State, which is the only moves that can justify a purge under the plain terms of the NVRA. It simply doesn't provide adequate evidence to come to the conclusion that the person has moved at all. Well, your argument is that failure to vote is not one of the listed grounds for being removed, right? That's the argument you've just made? Yes, Your Honor. But is that what Ohio does? Does it say the failure to vote is a ground for removal? Or does it say that moving out of the district is a ground for removal, and failure to vote plays a part in the determination of whether a person has moved out of the district? It's evidentiary. It's not the ground for removal in and of itself. Well, of course, they do say that they are using the change of residency provision of 8a, and that's what they're trying to justify the supplemental process with. But if, in fact, it does not do that, then it becomes illegal. And the reality is that the failure to vote for two years tells you almost nothing about whether or not anybody has moved. Fifty or 60 percent of the voters in Ohio routinely don't vote over a two-year period. Yeah, I understand that. I wonder what your answer would be to this. Suppose the State statute said that if you have not voted for 20 years, then we're going to send out the notice. Would you say that that violates this Act? Well, it plainly violates the Act, Your Honor, because the Act says you can't use failure to vote as the reason for purging somebody from the roles. And what the supplemental process does is it says the reason we think this person has moved is because they haven't voted. It is the only piece of evidence that they have when they purge somebody that they have moved. Only the one that they have moved. Do you think that if somebody hasn't voted for 20 years, that doesn't raise an inference that the person has moved? Your Honor, in the legislative history, they rejected amendments precisely like that. They even rejected a hundred-year rule. They said we don't want failure to vote to be the basis for which people are purged. In and of itself. But, I mean, that isn't enough even to spark an inquiry by sending a postcard saying if, in fact, you've just decided you didn't want to vote for 20 years, but you really want to keep your name on the list and you're still in the district, send this back. That would be illegal? Your Honor, we're talking about the people who don't send it back, which, by the way, is the large majority of people. And when you don't get the notice back, what that tells you is absolutely nothing about whether the person has moved. And so when you get to the end of the three stages of the process, two years of non-voting, not getting the notice back, you have no idea why or where, and four more years of non-voting, the only evidence that they have that the person has moved is they're not voting. So it is, in fact, the sole reason that they're being purged. But if not getting the notice back tells you nothing, why did Congress make that part of the determination? It is a safeguard, Your Honor. It is a notice provision. It is a warning to the voter that their registration status is at risk, and it gives them two options. They can send it back if they haven't moved and they want to tell them I'm still there, or it says you don't have to send it back. You can just vote at some time in the next four years. But what reality is, most people don't send it back. And these statistics are in the record, Your Honor. We have Exhibit I to the state's initial brief in the district court. Our statistics, Ohio provided, and they do this every two years to the Election Assistance Commission, at page 63. And they say, here's what happens to these confirmation notices. And what it shows is in 2011, they sent out 1.5 million of these confirmation notices. What are they supposed to do? That is, every year, a certain number of people die, and every year, a certain number move to California, all right? We don't want them on the voter roll. That used to be a big problem, voting dead people. OK? What should the state do? The dead people aren't a problem, Your Honor. They're authoritative lists at both states and the federal government. They went and died in Hawaii. I don't know. They went and died in Alaska. They went and died in Tasmania. Is Rhode Island supposed to look at the Tasmanian voting record, or hospital records? It's a serious question. I don't think there's no answer to it. I want to know your opinion. Any realistic concern about the death issue, Your Honor? There are ways that people are informed about deaths. There are lists that are maintained by the federal government and the states. And they don't even defend this as a way to identify them. I want to know what they are. I am very ignorant in this field. I'm in Rhode Island. I see the statute. I know some people have died, maybe in Rhode Island, maybe outside. Maybe they've moved to California. I don't want them voting in my state or people pretending to be them voting in my state. What do I do? I do not have a detailed understanding of this, since it wasn't really part of the issue for this case. But I understand that there is a national database maintained by the federal government with information provided by all the states that lists who's died in the past year. And you can compare it. Well, what about people, Justice Breyer's question also included people who move. What about them? People who move, there are a variety of ways that you find them. If they move within the state, the first thing that happens is the Bureau of Motor Vehicles has a change of address process. And under the NVRA and under Ohio process, if you change your driver's license address, your registration is automatically updated. You're registered. If you move from Cincinnati to Cleveland, you are fine. Well, how often do you change your driver's license? Well, when people moved to a different place in Ohio, they're required to notify them within 10 days. That's the law. Whether people do that, I don't know. But then you have the NCOA process. When people move to another county or state, the odds are they post a forwarding address with the post office. That address, then, on an annual basis, those addresses get compared to the statewide database. And those people get taken care of long before the supplemental process. Are there statistics? Or is that just a common sense argument? Or are there statistics that show that? Show what, Your Honor? That when you move, you always notify the people. No, Your Honor. It is just common experience. I don't think there are statistics. Certainly, the state does not have any statistics they've ever suggested for why they don't. I'm sorry, Mr. Smith. I thought I read it was 40 or 50 percent. No, Your Honor. The statistic in the record is that 40 percent of the mail that gets returned for as undeliverable is because people have not posted a forward address. It's likely to be a much smaller percentage of people who don't actually do that when they move to a different county or state. Under your interpretation, could Ohio send address verification notices to the entire electorate and then do what it's doing? The confirmation, the forwardable ones that they do under the confirmation process. If they did that to the entire electorate, it would not violate 8B2, but it would most assuredly violate 8A because... So the fact that they use a general mail to everybody wouldn't affect the outcome in your view? No, it wouldn't, Your Honor, because what happens is if 70 percent of the people don't return them, that's what the statistics show about the notices in 2011, 10 percent were returned as undeliverable, 20 percent were returned, and 1.2 million people just threw them in the circular file. What about sending a card? Look, the reason I'm asking these questions is because I don't believe Congress would have passed a statute that would prevent a state from purging a voting roll of people who have died or have moved out of the state. So I'm trying to reconcile the two. And therefore, I ask you what the state's supposed to do for that latter objective. And suppose they send a card which says, no forwarding, don't forward. And their theory of that is if the person has moved, and they wait long enough, and they send it a couple of times, the post office will send it back. And then they'll know the person's moved. Your Honor, that is the precise system that 14 or so states use to identify people have moved. And the key feature of it is that it's not forwardable. Because then it comes back if they've moved. And you think that's okay? The Justice Department for 20 years said that was okay. I think it's okay too, but you then have to go into the confirmation process. Okay, I got my answer. Can I add one thing to it? I'd like to add that because they don't want to send non-forwardable cards to everyone, since it's expensive in a state like California, it might cost several tens of millions of dollars. What they do is they send those non-forwardable cards to people who haven't voted for three or four years. Okay, now is it okay? If they only proceed to purge people when it comes back and says no longer at this address, undeliverable, I think it's fine, Your Honor. Because it's not based on non-voting at that point, it's based on concrete, reliable evidence. So the triggering event can be the failure to vote. I would have thought that's inconsistent with the rest of your argument, which says what's wrong with this case, is that they use failure to vote to trigger the sending of the notice. Well, Your Honor, I think reasonable people could differ about this, whether that is illegal. But I think when you have an intervening cause that very clearly says this person has moved, just as when they return the confirmation notice and they say they've moved, that it's okay. Even if the reason they got the notice was non-voting, you have then some concrete information that says this person has moved. But I mean, the response is really the substance of your argument, which is it's still triggered by the failure to vote. And the law says you cannot use failure to vote in one of these processes. Well, Your Honor, I think that what the law says is failure to vote can't be the reason you're purging them. And when the only evidence you have at all that they have moved is not voting, then that's clearly the reason that you're purging them. And that's what the supplemental process does. For the people that don't return the card- They want to protect the voter rolls from people that have not, that have moved and they're voting in the wrong district. That's the reason. What we're talking about are the best tools to implement that reason, to implement that purpose. And Congress thought the worst thing you could do to try to find people who have moved is just look at who isn't voting. Because there were two problems with it. Congress knew there were vast numbers of people who simply choose not to vote. And that that was, therefore, a terribly inaccurate way to identify people who have moved. And it also said, very specifically, people, it's unfortunate that people don't vote, but they have a right not to vote. This is the Senate report. Many states, the committee recognizes that while voting is a right, people have an equal right not to vote. Is that, is that true? I mean, you think there is a constitutional right not to vote? This is a statutory right here, Your Honor, but I actually do think that- I understand it's a statutory, but there are many democracies that require you to vote, right? Australia, you get a fine if you don't vote, and other places. And I've certainly seen it proposed that it would be a good idea, given the low voter turnouts in our country, that we adopt something like that as well. And you think that would be unconstitutional? Well, I think there's a pretty persuasive argument to that effect in the National Libertarian Brief that was filed in this case, filed by Wilmer. I think, basically, they said it's a First Amendment act, and just as you have a right to vote, protected by the First Amendment, a right not to vote because you don't want to vote for any of those candidates would be protected as well, I would think. In your view, we have what's been called the safe harbor, that is, you use the post office notice of change of address, what else could be the trigger? There's the non-forwardable mail, the national change of address, there are the DMV records which come into play, they operate continuously. People are re-registered, and that's required by Section 5 of the NVRA, and there are interstate databases, the ERIC system is the sort of state-of-the-art interstate database that lists everybody who goes somewhere else and registers or gets a driver's license in some other state, all of that stuff is available to the state of Ohio. And I think it's important as well to understand the small number of people that they say they're looking for with this supplemental process. I mean, this is a very, it's a very important subject, it's a sensitive subject. There are, as a policy matter, there are strong arguments on both sides. Congress had struck a compromise. What we have before us is a question of statutory interpretation, not a question of what we think would be the ideal system for achieving the result of removing people who have moved from the voter lists. And you haven't said very much about the language of the statute. Yes, Your Honor. How do you get, if by reason of a person's failure to vote is not but for cause. How do you get around the language of B-2? Your Honor, the language of B-2 I think strongly supports our position. Because what it says is you can't have a system that uses non-voting as the reason for purging somebody except you can use C and D, which is to say you can use the confirmation process. And so non-voting can come into play at the end of the process, not at the beginning of the process. But that actually isn't what B-2 says. It does not say you can't use failure to vote as a reason for removing someone except that you can do what is set out in C and D. What it says is that the principle that you can't use failure to vote as a reason for removing someone may not be construed to prohibit. So it tells you how to interpret the first part of B-2. It is not an exception to the first part of B-2. Right, but it is an explanation that the one kind of consideration of non-voting that it should not be construed to prohibit is the part that comes in at the end of the process. And then they went on to emphasize the sequence. They say, A, they have not responded to the notice, and then they have not voted for two consecutive elections. That is very clearly what Congress was trying to preserve and to eliminate the tension, perceived tension between B and D in the old version. It says that it's all right if you followed either C or D. C and D, Your Honor. Well, it says you think you have to follow C and D?  That's not what it says. I like C, because clearly Congress anticipated that there would be something that would tell you that they have moved before you go into the confirmation process. Because a confirmation process consists, if they don't get the notice back, of no evidence at all about whether they moved from the notice. And four more years of non-voting, precisely the thing Congress said should not be the reason that you purge somebody. So the whole system only makes sense if you assume there's something like the NCOA process or some other indication that they have moved before you put them into the process. And if you don't have that, you're going to vastly over-purge people. That's precisely what Ohio does. Because so many people don't vote for two years, and they get put into this process where 70% of them don't send back the notice. And then four more years of non-voting, you're going to end up with- You just told me that it doesn't matter how many years is required by the trigger. It could be 10, it could be 20. Yes, Your Honor, because that's what the statute says. And that's- Well, where does the statute say that? It says two things. It says, A, don't purge people unless you have good reason to think they've moved. That's A. And non-voting for 20 years isn't good reason to think that they've moved? Well, it might be. I don't believe so. I mean, lots of people probably stay registered much longer than 20 years and don't move for 20 years. It's not an unusual thing in our country, I would believe. In any event, the statute that we're dealing with here says that the reason you're purging them cannot be their non-voting. And when they get through the end of the supplemental process, that is the only evidence they have that anybody has moved. Weak as it is, it's six years of non-voting, and a notice that doesn't get returned which tells them nothing. And so the entire process is- Well, it doesn't tell them nothing. It tells them that they did not respond to a notice that says, you're going to lose the registration if you don't vote through the two years, two elections. So it tells them something. They have more evidence than just that they haven't voted. And you've indicated that, under some circumstances, the method of the notification, as we have in the states that you reference in pages 14 to 15, that that is OK, even though it's triggered solely by the failure to vote. So I don't think you can maintain in a principled way the acceptance of the validity of those States' positions and your argument against the position here. Now, you may say, well, it makes a difference because of the quality of the information you get from one notice or another, but you can't just attack this on the basis that it's triggered by the failure to vote. You have to say failure to vote plus a method of notification that you think is not sufficient, because you do think, in other cases, failure to vote plus a different method of notification would be OK. Now, maybe your position still is the same, but it can't just base on the fact of failure to vote being the trigger. We're talking about the people who don't return the notice. And I think it's clear that nobody would claim, Ohio doesn't claim, that when they don't get anything back from the person, that that tells them anything about whether they're still living in the same place where they sent the notice or whether they moved to some other place. They're forwardable. They have no idea which trash can it was thrown in at, the original address or some other address. It simply doesn't give them any information. Now, the alternative to this is that they get more information. It's not just that it's not, you know, it's not returned, but that they've gotten the notice and they haven't voted in the subsequent elections. Right. Right. So in the end of the day, they have 6 years of nonvoting that tells them, they say that's some evidence that they've moved. It is some evidence. It's pretty weak evidence, but it's some evidence. But the statute says you need a lot better evidence than that, and the one thing we don't want you to do is use nonvoting, because people have a right not to vote and we don't want them punished for it. Roberts Well, maybe I'm just repeating myself, but you don't just have the failure to vote. You have the failure to vote plus the notification that you need to do something because you haven't voted. Now, in some situations, you think the notification is sufficient. So you would say in those, it's not just the failure to vote. But in this case, you say the notification is not sufficient, so it is just the failure to vote. It's a fundamental difference between when you get back something from the post office that is undeliverable, no longer at this address, and when you get nothing back. Yeah, I understand that. But the point is that your argument then really turns on the adequacy of the notice and not simply the fact that the notice is triggered by a failure to vote. Well, I think, Your Honor, the notice that's in the statute, the forwardable notice that Congress specifies has to be forwardable, was not designed to be a test of whether people have moved. It was designed to be a safeguard, a notice process telling people their rights were at risk, and they either have to return it or they need to vote sometimes pretty soon, or they're going to lose their registration status. To turn it into the test, the state says we could give this to everybody and then purge people when they don't return the notice on the assumption that that means they haven't moved if they don't return a notice and they don't vote for four years. It's the thing about that kind of notice is when 70 percent of the people don't return it, which is what happened in 2011 in Ohio, the ones who don't return it, you have no more idea whether they've moved or not moved. It's no more likely. Any stat on that? I mean, this does seem at the moment to boil down to an empirical question. You think that sending a notice which is forwardable is not going to tell you not much when it comes back because so many people just don't return notices. It's not going to tell you much when it doesn't come back. That's the problem. When it doesn't, exactly. Sorry, I misspoke. You think that returning a notice that's forwardable, when it doesn't come back, tells you virtually nothing because people just throw things in the wastebasket. It doesn't tell you. It tells you next to nothing. It doesn't tell you whether it's been forwarded to a new address. You don't know where. You don't know if they just got it at the old address or they had to forward. You don't know. But if it wasn't forwardable, you get it from the post office, that tells you quite a lot. Yes, Your Honor. Okay. Got it. Got it. Now, that's what you've just said. And if you're right on the first, then we have nothing left here or next to nothing left but the not voting. That's your point. Right. His point is we have something else. We do have the fact that that notice didn't come back, and that means more than you think it means. Okay? That's their point. They don't actually claim Now, if that's so, all I'm asking is, is there any place in this record that I can look for some numbers or surveys or something hard that will either support you or will support them? Your Honor, there is no evidence about whether or not people who failed to return the notice have moved because they have never claimed it was evidence that they have moved. Their only claim in this case is that we are targeting these people because there might be surveys about how many people throw everything in the wastebasket. I confess to doing that sometimes. And most people do. I know that's what your opinion is. And all I'm asking is, is there any hard evidence of that one way or the other? The evidence we have in the record is that most people throw it in the wastebasket. 70%, excuse me. Age. That's exhibit I to their brief in the trial court. Their report to the election assistance commission on their 2011, 1.5 million confirmation notices. 1.2 million were simply ignored. 10% were returned undeliverable. 20% were returned. That's the data on this. Now, I think the other important- Mr. Smith, there is one thing about, and maybe I should have asked this of the state. But once you don't return the notice, you get put on the inactive list, correct? That means that you no longer, does it mean you no longer get mailings about elections? Yes, Your Honor. It means you can still vote, but you can't, you're not notified of where your polling place is and you don't get the- You're not sent any more reminders about- That's my understanding. I may- It's one notice in four or six years. But you disappear for purposes of mailings. And you disappear from any further mailing. That's my understanding. I couldn't necessarily swear to it, Your Honor, but it's my understanding that that's the consequence of the inactive status. I'm sure, Mr. Murphy, you'll correct it if it's wrong. Yes. Now, let me talk, if I could, about this concept of proximate cause that's been brought up here. I think it's a misplaced concept here because the term that the Congress used multiple times was reason. And I think the reason has to be something that is causally linked to the underlying reason, which is that they think you've moved to a different county or state. And the only evidence they have at the end of the supplemental process of that is the non-voting. They don't even claim that the people, the 70% of people who don't return the notice, that that's evidence of anything. It is a hoop they have to go through. It is a safeguard. It is a requirement that Congress imposed. But it's not the reason that anybody is being purged in terms of the underlying issue of whether they've moved. But even if you want to do this proximate cause concept, as Justice Kagan pointed out, there are three things that have to happen, two years of non-voting, the failure to return the notice, and four more years of non-voting. And calling the non-return of the notice the proximate cause is like saying when you strike out, the only proximate cause is strike two. It just doesn't, it doesn't really make sense. So what is your standard of causation? It's not, it's not solely, it's not proximate cause. The only thing I can think of that's left is but four. I think that the analysis ought to be based on the term reason, not cause, Your Honor. It's not a tort law. I don't understand why it's just, it's proximate cause, but both strike one, strike two, strike three, they're all proximate causes of the strikeout. I agree with that, Your Honor, as well. I just think that that's not the right way to think about it here. The reason that they're being identified as having moved is because they're not voting. That's the reason. Well, in Hava, Congress used the term solely. Could you say something about that provision of Hava? That says that states shall include provisions. It's mandatory to have a system of file maintenance that makes a reasonable effort to remove ineligible voters. And goes on to say, under this system, registrants who have not responded to a notice and who have not voted in two consecutive general elections for federal office shall be removed from the official list of eligible voters. By itself, that seems pretty clear. How do you get around that? Well, Your Honor, I think the accept clause is a reference to the same principle that's set forth in B2. B2, which is to say, the reason that you're getting put into the purge can't be simply not voting. Except, but it goes on to say, except that no registrant may be removed solely by reason of failure to vote. Right. Now, under Ohio's system, is someone removed solely because of failure to vote? Yes, Your Honor, absolutely. So the notice is, there's no requirement? If somebody doesn't vote forever, but returns that notice, the person would be removed from the list? We're talking about people who don't return the notice. The case is only about people who don't return the notice. No, I understand that, but I don't see how that's solely. Well, because the only evidence that they have that you've moved, which is the permissible category, is your non-voting. And so Congress, when it wrote that, would have thought that the supplemental process removes people solely for non-voting. It didn't think of the confirmation process as a reason to remove people. And it certainly didn't think non-return of the notice was a reason to remove people. It was looking at- If somebody returns the notice, they never vote, but they return the notice. Are they removed from the list? When they return the notice, the question is, what do they say? Do they say, I'm still living on Main Street like I always have? Then they stay on the list. If they say, I've moved to Oklahoma, then they get purged. But in either event, the state then has direct information about where they live and can take whatever action it should. The problem we have here is that this kind of notice, which, by the way, says you don't have to return it. You can just choose to vote sometime in the next four years, most of the time isn't going to get returned. And so it doesn't provide you any evidence at all on which to decide that these people should be purged. And you end up with a system which looks an awful lot like the old Ohio use it or lose it system, which is some period of non-voting. One notice that most people don't return, and we're going to throw you off the rolls. Now, the other fact that's in the record is the small number of people that the supplemental process supposedly is trying to find. We have in the record evidence about how many people move to a different county or state in each year. This is evidence the state put in the record, exhibit E to their main brief in the district court, and it shows that about 3% of people in this country move to a different county or state outside of the registrar's jurisdiction, to use the terminology in the statute, 3% a year. That's a small number by itself, but then the supplemental process only is triggered to try to find some sliver of those people who have not already been identified because they changed their address with the Bureau of Motor Vehicles. Or because they posted a forwarding address with the post office. And so- Mr. Smith, could you give me concrete numbers? How many voters have been purged as a result of this system? Well, Your Honor, I can't give you exact numbers, but I would refer you to the Biennial Election Assistance Commission reports that look in detail at all the state's processes with respect to registration and purge. I do know that two things I can tell you, Your Honor. It's certainly in the hundreds of thousands in many years. It was something like several hundred thousand in 2015, according to the more recent report that's not in the record. And I can also tell you that the evidence shows- But you gave me 3% of people nationally move. Move to a different county or state. I guess what I'm trying to get to is about how many people in Michigan actually move. Well, the Ohio, the statistics that were put in were national, but those- I'm sorry, I misspoke in Ohio. Ohio apparently thinks it's pretty, the national statistics represent Ohio, because that's the statistics they put in. I don't think the census does these mobility statistics by state, or at least that's not in the record. But 3% is roughly the right amount, but then you'd have to reduce that- I don't know 3% of what? People move in each year. I understand that, but what's the 3% of what greater number? Of all people in the country. Of all people in the country. Yes. So we have to divide it up and do that. Well, it is, in other words, only 97% of people do not move to another county or state in any given year. That's what the statistic is. And then, most of those 3% are going to be located, presumably, in one of the other ways. So we're talking about a relatively tiny group of people, which they then, the process that they then use begins with 50 or 60% of people who don't vote for two years. Thank you. Can I have a couple of minutes as well? And so, you know, the process is vastly overbroad in its design to try to find this relatively small group of people. Starting with 50 or 60% in an off-year election that don't vote, 70% don't return a notice. You're just going to end up with a lot of false positives in the end. And that is, in fact, how this system is operating. It finds a lot of people that supposedly have moved who simply haven't moved. I think I'll leave it at that, Your Honor. Roberts. Thank you, counsel. Two minutes, Mr. Murphy. Thank you, Mr. Chief Justice. The first question I'd like to answer is about the statistics of the number of people who move without notifying the post office. That is in the record. There's an Inspector General report that suggests that 40% of individuals don't notify the post office.  I think this is significant because it shows why the postal service provision is a safe harbor for meeting the state's obligation to remove individuals. Because it's going to be woefully insufficient for that task. States are going to have to do other efforts if they actually want to maintain adequate rules, rather than just worry about the threat of getting sued on the other side of the compromise that is at issue here. And I think this goes to that this, in the end, was a statute that was balancing competing purposes. On the one hand, trying to remove ineligible voters. On the other hand, trying to ensure protections for eligible voters. And it came up with a compromise. And that compromise left a lot of room for states in our Federal system to adopt the procedures that are best in that state. And with respect to sending information, I would say that my friend on the other side mentioned the ERIC program. Ahead of the 2016 election, Ohio sent something like 1.6 million letters to potentially eligible yet unregistered voters. Many of those, if they were removed under our process, could have received this notice from ERIC ahead of the registration deadline, encouraging them to register. I'd also note that- They've been struck. They get one notice, they're put on the inactive list, was I correct about that? Under the NVRA, you're only, the minimum requirement is- I'm not asking under Ohio's law, do they get only one notice? Only one notice, but- They don't get a notice when they're purged, so they don't know they've been purged. They have to go to the polls to find that out. That's why I was mentioning the ERIC program, because we just sent 1.6 million letters to all potentially eligible voters who were not registered. Would you answer my question? Are they ever sent, anyone who sent a notice and put on the inactive list, are they ever again sent any voting information outside of this ERIC program? So Matt Damschreuder's declaration at Doc 38-2 suggested that the state ahead of the 2016 election sent absentee ballot applications, so you could vote because we have no excuse. Voting, that would have gone to many of these individuals. Not everybody. It would have gone to any of the individuals who had been sent this notice and had voted in the previous election, 2012. Thank you, counsel. The case is submitted.